Good morning, Your Honour, Your Honours. If it may please the Court, my name is Timothy Coleman. I represent the appellants in this case, Muneeb Zirvi, Matthew Lubin, Maria Kempe and Norman Jerry. I'd like to start off by just giving an outline of the issues that the District Court wrongfully dismissed this complaint on the basis that the plaintiffs were put on actual or constructive notice regarding the breach of their trade secret. We would argue that they were not. The District Court conflated patents. Hold on one second. There's someone on the call who is not on mute. We can hear loud The District Court conflated patents with trade secrets. The plaintiffs' trade secrets have never been published. They've never been disclosed. And the plaintiffs have diligently protected those trade secrets. And Your Honours, this is a quintessentially fact-driven case. The District Court applied the wrong standard with regard to inquiry notice. They erred in considering the plaintiffs' relative intelligence and sophistication. The knowledge that they should have used was one of an objective standard, as this Court has, in fact, used instead that of a person of ordinary intelligence. And even absent fraudulent concealment, an ordinary person would not have ever connected the patent infringements to the trade secrets infringement. In any event, under either standard, the District Court erred in concluding that the plaintiffs were on inquiry notice in 1994, in 1999, in 2003, and in 2006. Let me ask you this. The alleged misappropriations are the ones in 1994 and 1999? No, Your Honour. If I may clarify, thank you. In 1994, the actual sequence, the actual sequence of zip codes was not invented, not discovered, let me say, until 1999. So 1994 is, to a large extent, irrelevant. But what it does show, Your Honour, and this is why it's been put in the complaint, it just is part of the overall patent. But whether it's a trade secret claim or whether it's a patent claim, the basis for those claims would be what happened in 1999 or before? Is that so? The basis of the claim, in the sense, Your Honour, that the trade secrets were created in 1999, that would be correct. In the sense that the plaintiffs could not possibly have known that there was any misappropriation at all by virtue of the conduct of the defendants, they would not put on any notice whatever until 2015. And then, Your Honour, it took another two years of detailed forensic examination to, as it were, decrypt what had happened. And so why, you know, there were these proceedings in front of the PTO in 2006 and in the Delaware Federal Court in 2010, why did they not put the plaintiffs at least on constructive notice? For several reasons. Number one, Your Honour, there was no indication whatever that the plaintiffs' trade secrets were in any way involved or implicated. Second, one of the reasons why the plaintiffs did not know that was because of the fraudulent concealment of the defendants themselves in the way that they willfully and deliberately disguised what they were doing, using different nomenclature and names and so on. And thirdly, because the plaintiffs were not on any notice whatever, they did not even know, they had no idea that their trade secrets were even going to be a part of this. And then the fourth thing, Your Honour... Weren't some of the plaintiffs a party to, named as a party? There were two plaintiffs, Your Honour, that were, as it were, a party in name and name only, having been licensed sorts, but they were not given any notice. They had no knowledge that there was any patent infringement. How can someone be a party in name and not be given notice? In the sense that, Your Honours, that they were given, they gave over the entire rights of the intellectual property that was being litigated to Cornell University. And in that sense, although they were, as it were, plaintiffs, I'm sorry, Your Honour... Were they listed as witnesses? They were never listed as witnesses, Your Honour. They had no knowledge of the actual lawsuit at all. Does it matter that these are public proceedings? I mean, quite often in these kinds of cases, you know, the litigants point to news articles, etc., which arguably should give someone notice. And there's case law on that. It does matter. It very often could matter that this is a public proceeding. But the question is whether it would be, whether a reasonable person of ordinary intelligence would be given notice by virtue of that public proceeding that there was a possibility that their own trade secrets were somehow implicated. And I would argue respectfully that that was absolutely not the case. Not only was there no notice, not only were they not told, not only were they not contacted, not only did they have no idea, but even if they had, they would never have known that there was any possible implication of their own trade secrets being a part of it. This was a patent case, Your Honour, it's not a trade secret case. You suggested earlier that the plaintiffs had given their rights to Cornell. If they gave away their rights to Cornell, what is the, I don't understand, what is the basis for the claim now? I appreciate the opportunity to clarify that, Your Honour. They did give over a number of rights, a lot of rights regarding the sequences, but what they did not give over and what was never given over and what they kept for themselves was the specific order, the specific sequence of zip codes, which is very, very essential in order to make these zip codes work. And that was never given, it was never transferred, it was never publicised, and yet it was stolen. And that is what we're talking about here. Those are the trade secrets. They are what is left, as it were, from the transfer. If they were so, I mean, you know, you're saying that notwithstanding these public proceedings and notwithstanding all of the events up to 2012, 2013, 2014, this particular sequence was critically important to your clients, right? Yes, critically important. And yet there are patents that are maybe not centrally about the sequence, but that might involve the sequence. Is that correct? Yes, Your Honour is correct in the sense that this is where it gets tricky. So there was intellectual property that was transferred in patent, but this specific order of sequence was never, ever transferred. It was stolen, it was taken. Right, but these are the, well, this is my unscientific word, the crown jewels of the patent and of the trademark, right? And so I think, well, I guess my question is, if those are the crown jewels and the patents, any patent litigation might touch on those crown jewels, why is then not sufficient? So it's not just... Allow me to explain. Yes, Your Honour, allow me to explain. If you read, if you look at the complaint, you will see how the actual patents themselves were disguised. They were completely disguised. In other words, different terms were used for zip to even know what it was that the defendants were patenting. Second, as far as the sequences were concerned, it's also very important to know that we did not know that the sequences were even being implicated. If you, in the complaint, it shows that in order to determine that the sequences were even involved, that involved a decryption. And the reason for that, Your Honour, was because the defendants were attempting to pull a fast one on the patent office. That was their main concern. They wanted to patent trade secrets they did not have. They wanted to patent sequences they did not own. And for that reason, they deliberately disguised both in the nomenclature of those zip codes and the persons who were asking for it. In other words, often they went forward with a patent office, which is also improper, possibly illegal. And so there was this whole cloud, if you will, of fraudulent concealment. So my clients could not possibly have been put on notice. All right. You have some time for rebuttal. We'll hear from Mr. Bach. Thank you, Your Honour. Good morning. May it please the court. My name is Jonathan Bach and I am speaking today on behalf of all at police. Mr. Bach, just speak up a little bit. Certainly. In a careful and well-reasoned opinion, the district court properly dismissed this lawsuit. It did so after granting the plaintiffs two prior opportunities to amend. Both of those the grounds on which they were seeking dismissal. Plaintiffs were thus well aware of the issues and joined the meeting and twice did their best to address them. But the problems that they confronted were insurmountable. No amendment could overcome the statute of limitations and other issues that cried out from the very terms of their own extensive 750 paragraph complaint. The conduct complained of occurred decades ago in 1994 and 1999. Plaintiffs' multiple state law claims, most of which they have now conceded or abandoned on appeal, expired three years later. That is with the exception of the New York fraud claim, which expired six years later. The federal claims are based on statutes with no retroactive application that were not even enacted until some 17 years later in 2016. Contrary to what you may have just heard, the so-called crown jewels were disclosed by Mr. Zerbe and Dr. Barony in a patent as far back as 2001, which included all of the 16 zip code sequences that my friend just spoke about, as well as thousands. Where is that in the record, Mr. Barony? It's in our brief. I'll have to find a specific site. We will talk about an application, the 965 patent that was filed by Plaintiff Zerbe and Dr. Barony of Cornell in August 2000. It was published internationally in and it also disclosed an 18-step algorithm for anyone reading the patent to generate them, as well as a software code connected to that algorithm so that the recipe for generating these zip code sequences, as well as the crown jewels, was disclosed some 17 years before this lawsuit was filed. The trade secrets relating to the 1994 grant proposal were filed on the public record by Cornell in 2007 in connection with the 2006 interference proceeding. They're accessible via the internet. Counsel argues that not everything was given over to Cornell and therefore not everything was disclosed. How do you respond to that? I don't think that is what the second amended complaint alleges. The second amended complaint alleges that there were two items that contained all of the conceivable alleged trade secrets at issue. One was a 1994 grant proposal, which Cornell submitted to the National Cancer Institute in 1994. The other was a compilation of 187 Microsoft Word and Excel files that Cornell had in its possession and turned over to a company called PE Biosystems in 1999. As the second amended complaint reads, those 187 files contained all conceivable alleged trade secrets, whether positive, whether negative, whether patented, whether not patented. That's the whole compilation of trade secrets at issue here. They were the subjects of disclosures in those years. The complaint certainly doesn't acknowledge actual notice. What is there to suggest there was actual notice, if there was actual notice? We are bound, as Your Honor no doubt knows, by the four corners of this complaint. The complaint does not allege actual notice. So you're only relying on constructive notice? We're relying on constructive notice and the concept of inquiry notice as well. Okay. I can answer a previous question about where in the record the patent that disclosed the recipes and the crown jewels can be found. The international publication of that patent can be found at the joint appendix between pages 351 and 366. As Your Honors know by this point, a key point that we have emphasized throughout is that these prior litigations which span the public record, which were conducted openly, took place over a course of more than 10 years and were not brought by strangers to these plaintiffs. They were brought by people with whom they had a personal relationship, with people with whom they had a working history, with people with whom they developed these very secrets, with the people to whom they entrusted these trade secrets at key points, including just before the submission of grant proposal and just before the alleged disclosure in 1999 to PE Biosystems. So it's not as if we are expecting, you know, members in a shareholder suit, members of the investing public who have no knowledge about particulars other than they happen to own shares. These are, plaintiffs are closely, as closely as one can be connected to Cornell and Dr. Baroney who are directly taking part in these very public lawsuits. They were named as parties, some of these plaintiffs were named as parties, and they were named as witnesses as well in the 2010 Cornell patent infringement. So Mr. Coleman answered that question in negative, that is that they were not named as witnesses. Yes he did, and I believe he misspoke because his own complaint says that they were witnesses and he claims, the complaint alleges, that it was in that capacity that they finally discovered their claims. Mr. Bakke, you mentioned 351. What, and I'm looking at it, what is this? Bear with me, Your Honor. Sure. Just trying to understand what exactly it is that I'm looking at. I am, let me describe to you what you should be looking at. There's a patent application filed in August 2000 by Mr. Zerbe and Dr. Baroney. Yes. Which patents a huge number of these zip code sequences, the important sets that you've heard this is an application, an open application for these patents that include the crown jewels that Mr. Coleman and I were discussing. Mr. Coleman has said that there was, these trade secrets were never disclosed. I think he misspoke in his argument because they were all disclosed either in the context of the 2016 grant proposal or they were disclosed in the context of, many of them were disclosed in the context of this internationally published and then published in the U.S. patent application. Just to be clear, I mean, the patent application is a publicly filed document available for anyone to see? That is correct. And this was filed by plaintiff Zerbe. So even if the public didn't get to see it, he was intimately familiar with it. And they argue that there are some negative trade secrets that slipped through the cracks and may have never been disclosed. Judge Kodal urged them to clarify what those may be. In any event, this, these pages that I'm referring Judge Lohier to also include an algorithm and a software code that teaches people how to find these zip codes on their own. Negative trade secrets are research dead ends. They're what you shouldn't be doing. But once you've disclosed what you Judge Kodal found that they couldn't plausibly claim that there was any continuing value to a dead end that allegedly arose some 20 years before. I see my time is up. I'm happy to answer further questions if your honor's happy. Thank you. We'll hear the rebuttal. Mr. Coleman. Thank you, your honor. I believe my learned colleague may be a little confused about a couple of things. First of all, with respect to my client being a witness when he observed, he was only a witness in 2015. He was not a witness in the 2006 issue, which your honor raised before. As it were, was he put on notice? I said he was a licensor. He never knew about the litigation. He never knew. He never was put on notice. With respect to the other issues, I will go swiftly. He was not listed as a potential witness. He was. I do not believe he was listed as a potential. He got no notice that he was ever a witness. He had no lawyer. He was never called. They never asked him for any evidence. He had no clue it had gone forward, and I believe that is set forth in the second amendment complaint in detail. Let me just go through and correct just a few issues, and I hope this addresses any concerns that your honors may have. Number one, it's interesting that one of the things that my colleague does not address is actually the ongoing fraud that has been, I think, set forth and described with enormous particularity going all the way back to 1994. In other words, the way in which the patents were themselves fielded and how it was that there were patent disputes and what it was the defendants did to actually disguise what they were doing. Far from actually disclosing the particular sequences, they did no such thing. Yes, the sequences were found. They were discovered, buried in the patents, but only after decryption. Let me be clear. So in the year 2000, it's true, 465 zip codes did appear in August 25, 2000, the patent application, but they were in a different order, and I refer your honors to second amendment complaint 155. However, the very next paragraph of our complaint 156 specifically states, this is actually the plaintiff's precise order of those sequences, which was protectable and not published. And it's those sequences of numbers which are protectable, which are never published. In fact, they were, and my colleague is correct. Yes, they were given to the defendant, PE Biosystems, later Thermo Fisher, who then improperly and illegally shared it with Illumina. My clients had no clue that that was happening until far, far later. And indeed in 2015, when my clients got only an implication that this was going on, did they then go forward with an exhaustive two years analysis. If I could just conclude, because I see my time is getting short. Your time is up. I'm so sorry. Thank you so much. Thank you. I would just say that all this shows, your honors, that this is an incredibly fact-involved case and should not have been dismissed so summarily on a 12B6 motion. We would request respectfully, if it's at all possible, that we be given the opportunity to amend it at least one last time so that we can clarify these issues perhaps more succinctly and clearly for the court. Did you ask for an amendment? I did ask for one, I believe. I think it's in our appeal. All right. Thank you. The court will reserve decision.